IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 23, 2024

## STATE OF TENNESSEE v. VALERIE ANN DOLLAR

**Appeal from the Criminal Court for Johnson County**
**No. 2018-CR-82    Lisa N. Rice, Judge**

_____

### No. E2023-00531-CCA-R3-CD
_____

The Defendant, Valerie Ann Dollar, was convicted by a Johnson County Criminal Court jury of first degree felony murder in perpetration of kidnapping, especially aggravated kidnapping, and conspiracy to commit especially aggravated kidnapping. *See* T.C.A. §§ 39-13-202 (2018) (subsequently amended) (first degree murder), 39-13-305 (2018) (especially aggravated kidnapping), 39-12-103 (2018) (conspiracy). The trial court imposed an effective life plus twenty-year sentence. On appeal, the Defendant contends (1) that the evidence is insufficient to support the convictions and (2) that the trial court erred by excluding evidence of the State's pretrial offer to dismiss the murder charge. We affirm the judgments of the criminal court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and J. ROSS DYER, JJ., joined.

Patrick Denton, Johnson City, Tennessee, for the appellant, Valerie Ann Dollar.

Jonathan Skrmetti, Attorney General and Reporter; Courtney N. Orr and Abigail H. Rinard, Assistant Attorneys General; Kenneth C. Baldwin, District Attorney General; Dennis D. Brooks and Robin Ray, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

The Defendant's convictions relate to the kidnapping and death of Carlton Edmonson. The Defendant and the codefendants, Brittany Arnold, James Combs, Michael May, Robert Littleton, and Leigh Katherine Littleton, kidnapped the victim because they believed the victim failed to deliver drugs to them for which the victim had received money. After attempts to collect a ransom from the victim's family failed, codefendants Arnold

and Robert Littleton brutally assaulted the victim, and then the Defendant and codefendants left the injured victim to die in a remote, wooded area in freezing temperatures. The victim was never seen or heard from again and his body was never recovered.

The Johnson County Grand Jury charged the Defendant and the codefendants with one count each of first degree felony murder in perpetration of kidnapping, especially aggravated kidnapping, conspiracy to commit especially aggravated kidnapping, extortion, conspiracy to commit extortion, and aggravated assault. The Defendant's case was severed from the codefendants'. Before the Defendant's trial, the State dismissed the aggravated assault charge and filed a motion in limine requesting the court to exclude "any evidence of or reference of unaccepted plea offers during the trial." The court granted the State's motion.

At the trial, Irea Uebele testified that she had lived with the victim, who was her cousin. Ms. Uebele said that on the morning of January 19, 2018, she received a phone call from a man who identified himself as "Jeff" stating, "Ma'am, we have your family member." She stated that she could hear someone hitting the victim, that the victim screamed loudly, and that the victim repeatedly said, "Please help me. They're going to kill me." She said the caller told her that the victim had been at the caller's house for three days and that the victim stole $700. Ms. Uebele said she could hear more than five "different voices," including a woman's voice, and that she heard "laughing as they were beating [the victim]." She said that she offered the caller her wedding ring, which she valued at $4,800, in exchange for the victim, but the caller refused the exchange and ended the telephone call. Ms. Uebele said that in response to a text message to the caller requesting "proof of life," she received a telephone call saying that she could speak to the victim "one last time" and that during the call, the victim said, "I'm going home" and "They're going to kill me." Ms. Uebele did not speak with the victim again.

Ms. Uebele testified that she received a subsequent call during which the caller identified Ms. Uebele's address and threatened to kill her if she did not provide the ransom. Ms. Uebele said that she was home with her children at the time. Ms. Uebele said she called the victim's mother, who called the police. Ms. Uebele stated that an internet search associated someone named "Combs" with the caller's telephone number.

Lanisha Kincaid, the victim's mother, testified that she received a panicked call from Ms. Uebele indicating that someone had the victim and was going to kill him. Ms. Kincaid said that she called the telephone number of the man who had called Ms. Uebele. She said that a person named "Jeff" answered, that he told her the victim owed him $700, and that he allowed her to talk to the victim. Ms. Kincaid said the victim told her that people he "f----- up" were going to kill him. Ms. Kincaid said she called the victim's father regarding the $700 ransom and also contacted the police. Ms. Kincaid stated that she continued to exchange telephone calls with the kidnappers until early in the afternoon, that

she could hear them "still laughing" while the victim was "hollering," and that the caller suggested places to exchange the victim for money.

Ms. Kincaid testified that the North Carolina State Bureau of Investigation (NCSBI) became involved in the case and listened to several of the telephone calls. She stated that all the telephone calls were from the same caller and the same telephone number until the last call. Ms. Kincaid stated that during the last telephone call, she told the caller that she was still at her home, and the caller replied, "I'm done," and ended the telephone call. She said she never heard from or saw the victim again. She said the victim was age twenty-nine when he disappeared.

Ms. Kincaid testified that the victim did not own a home, car, or have a driver's license and that he had recently taken a job at a restaurant. She said that the victim called her every morning and that they had a close relationship. She stated that she contacted family, friends, and the media when the victim disappeared. She said that several months before the kidnapping, the victim had been out of contact with her for about a week.

Robert Pearson, the victim's father, testified that he received a telephone call from the victim, who sounded scared and who requested "help" and $700. Mr. Pearson said that when he responded that he did not have the money, another voice on the call said, "Well, that's all I need to know," and the call ended. Mr. Pearson said that he tried to send a text message and to call the number, but no one responded or answered. Mr. Pearson said that Ms. Kincaid also called him to discuss the telephone calls she had received. Mr. Pearson said that he and Ms. Kincaid told police officers what had happened and that officers began to search for the victim.

Mr. Pearson testified that he kept in regular contact with the victim and that he had not heard from his son since the telephone call requesting help. Mr. Pearson identified a photograph of the victim and a pair of the victim's shoes, both of which were received as exhibits.

Valdese, North Carolina Police Department Officer Michael Branch testified that he met with Ms. Kincaid on January 19, 2018, and was present for telephone calls from a man requesting money in exchange for the victim. Officer Branch said that other officers and the NCSBI were involved in the case. Officer Branch stated that during the calls he heard several voices, including a female voice.

Haley Coley testified that she and the victim were friends and that they were involved in illegal drug use. She stated that on January 18, 2018, codefendant Robert Littleton came to her house "needing drugs." Ms. Coley said that she contacted the victim to purchase a quarter ounce of cocaine. She said that she and codefendants Robert and Leigh Katherine Littleton rode in their car to meet the victim. She said that the victim and

codefendant Robert Littleton went inside a house and returned discussing how they had not received the quantity of drugs that they should have for the money paid. She said that codefendant Robert Littleton told the victim to "figure out what to do to get the money back" and that the victim suggested they go to Boone, North Carolina, to meet with someone. Ms. Coley stated that they got into the Littleton's car and that codefendant Leigh Katherine Littleton drove them to a camper where the Littletons lived. Ms. Coley said that before approaching the camper, someone "made [the victim] put something over his eyes."

Ms. Coley testified that, at the camper, codefendant Robert Littleton cooked dinner for everyone and then told Ms. Coley and the victim to stay in a bunk bed. She said that while she and the victim were in the bunk bed, she heard a man and a woman arrive. She said that the victim was taken to where the others were located in the camper, that she overheard "a man" warning the victim about what could happen to him, and that the victim returned to the bunk bed. Ms. Coley said that the man and woman stayed only a short time after which Ms. Coley, the victim, and codefendants Robert and Leigh Katherine Littleton went to a hotel in Boone where the victim went inside to purchase more drugs. Ms. Coley said that the drugs the victim purchased at the hotel were "fake," making codefendant Robert Littleton "angry and frustrated." Ms. Coley said that they left the hotel and drove Ms. Coley to her home. Ms. Coley said that the victim tried to leave with her but codefendant Robert Littleton blocked the victim and "wouldn't let [the victim] out of the car."

Ms. Coley testified she told law enforcement that codefendant Robert Littleton called her after she returned home saying that the victim was "on his way back home to Morganton." Ms. Coley acknowledged that her recollection of events might be affected by her "extensive" drug use at the time.

On cross-examination, Ms. Coley testified that she, the victim, and codefendants Robert and Leigh Katherine Littleton had been using methamphetamine at the camper. Ms. Coley stated that the man and woman who came to the camper were codefendant Combs and the Defendant, that they stayed approximately thirty minutes, and that Ms. Coley did not recall hearing the Defendant talk to the victim at that time. Ms. Coley said that "within hours" of returning home, she reported her concerns regarding the victim to law enforcement.

Johnson County Sheriff's Officer Jeremy Brown testified that he was contacted by the NCSBI on January 19, 2018, to assist with an investigation regarding a missing person. Officer Brown said that he located codefendants Robert and Leigh Katherine Littleton in Mountain City, Tennessee, the next day, that he took both Littletons to the sheriff's office, and that he arrested codefendant Robert Littleton pursuant to a North Carolina arrest warrant. Officer Brown stated that he drove codefendant Leigh Katherine Littleton to an area she identified near Canter Road in Trade, Tennessee, and that she directed Officer

-4-

Brown to drive down a dirt, remote, snow-covered road to a spot where he saw a "reddish-brown substance," which he thought was blood. Officer Brown stated that he also noticed an area where it appeared that a person had been lying on the ground. Officer Brown stated that he considered the area to be a crime scene, secured the scene with tape, photographed the area, and collected a swab of the reddish-brown substance for testing. Photographs and video evidence of the Canter Road location were received as exhibits.

Johnson County Sheriff's Investigator Matthew Cress testified that an extensive search was conducted of the Canter Road and Stone Mountain areas and included the use of a helicopter, cadaver dogs, search teams, and drones. He said that the search efforts failed to find any evidence of the victim.

NCSBI Agent Ronald Crawley testified that he gathered information regarding cell phone numbers and text messages associated with the Defendant, the codefendants, and the victim's family members. The records were received as exhibits. Agent Crawley determined that codefendant Combs's cell phone was used to call the victim's cousin, the victim's mother, and the victim's father multiple times on January 19, 2018. Agent Crawley determined that codefendant Robert Littleton's cell phone was used to make one call to the victim's mother at 2:49 p.m. on January 19. On January 18, at 5:56 p.m., codefendant Combs's cell phone was used to call the Defendant's cell phone. On January 18, at 11:05 p.m., codefendant Robert Littleton's cell phone was used to call the Defendant's cell phone. On January 19, codefendant Robert Littleton's cell phone was used to call the Defendant's cell phone at 12:54 a.m., 1:24 a.m., and 6:43 a.m. On January 19, codefendant Combs's cell phone was used to call the Defendant's cell phone at 7:20 a.m., 7:28 a.m., 7:29 a.m., and 1:55 p.m. On January 18, the Defendant's cell phone was used to send a text message to codefendant Robert Littleton's cell phone at 10:01 p.m. and 10:29 p.m.

Agent Crawley testified that Facebook records showed messages between the Defendant and codefendant Robert Littleton on January 18 and 19, 2018, including a message on January 19 at 1:15 a.m. in which codefendant Robert Littleton requested that the Defendant come to codefendant Robert Littleton's camper followed by a Facebook call at 1:28 a.m. Agent Crawley testified that there were no calls from the Defendant's cell phone to members of the victim's family.

Watauga County, North Carolina, Sheriff's Detective Terry Julian testified that video surveillance of Highway 421 going from North Carolina to Tennessee showed the Defendant's grandparent's truck driving into Tennessee around 12:30 a.m. on January 19, 2018, leaving Tennessee around 4 p.m. the same day, and returning to Tennessee around fifteen minutes later.

Tennessee Bureau of Investigation (TBI) Agent Jillian Welker, an expert in forensic serology and DNA testing, testified that there was a 99.9999 percent probability that the reddish-brown substance found on the dirt road was the blood from a biological child of Ms. Kincaid, the victim's mother, and Mr. Pearson, the victim's father. Agent Welker said that DNA testing did not indicate the presence of blood in the Defendant's grandparent's truck. Her reports were received as exhibits.

TBI Investigator Scott Lott testified that a search of codefendant Robert Littleton's car resulted in finding a cell phone that contained two video recordings created on January 19, 2018—one at 7:35 a.m. and one at 3:00 p.m. The video recordings were received as exhibits.

Officer Brown was recalled and testified that according to the thermometer in his patrol car, it was fourteen degrees Fahrenheit on the morning of January 20, 2018. United States Department of Commerce certified weather records for Mountain City indicated that the high temperature on January 19, was twenty-nine degrees, and the high temperature on January 20 was forty-six degrees with a low of nine degrees. The records were received as an exhibit.

Officer Brown testified that the brass knuckles used to assault the victim were found in his patrol car after he transported codefendant Robert Littleton to the sheriff's office on January 20, 2018. Officer Brown said that despite media coverage regarding a missing person, law enforcement did not receive any information that anyone had seen the victim after he disappeared.

The cell phone video recordings made by codefendant Robert Littleton on his phone were played for the jury. Officer Brown identified the victim and codefendants Robert Littleton, May, and Combs on the January 19, 2018, 7:35 a.m. recording that lasted approximately six and one-half minutes. Officer Brown identified the voices of the victim, the Defendant, and codefendants Robert Littleton and Arnold on the January 19, 3:00 p.m. recording. On the 3:00 p.m. recording, Officer Brown noted that codefendant Arnold kicked the victim in the face, that the victim's head showed evidence of trauma, and that the Defendant said, "Felt good, didn't it." Officer Brown said that the recording appeared to have been made outdoors in the same Canter Road area where he found what he believed to be blood. Officer Brown said that the recording also showed the license plate of a white truck registered to the Defendant's grandfather. Officer Brown said that the investigative interviews established that codefendant Robert Littleton had a camper in the vicinity of the area where the recordings were made. Officer Brown said the victim's shoes were recovered from codefendant May's home.

On recross-examination, Officer Brown testified that his investigation indicated that the victim had a "drug problem" and was under the influence of methamphetamine at the

time of his disappearance. Officer Brown said that the Defendant was not depicted in the January 19, 2018, 7:35 a.m. recording and that he was not aware of any evidence that she physically harmed or restrained the victim.

The 3:00 p.m. video recording showed the victim crouched low to the ground in a remote, wooded area with light snow and a small patch of blood on the ground. The victim had multiple head wounds with blood on his hair, face, and jacket. He repeated, "I'm sorry." The victim wore one shoe and only a sock on his other foot. Halfway through the forty-eight second recording, the victim was kicked in the face, fell backward on the ground, and did not move again. The recording showed the blood-soaked shoe of someone standing over the victim, and others could be heard making threatening remarks to the victim, who appeared to be unconscious on the ground.

Former Watauga County Sheriff's Investigator Jaska Rominger testified that she interviewed the Defendant three times in January 2018. The video recordings of the interviews were received as exhibits and played for the jury.

During the interviews, the Defendant said that codefendant Robert Littleton asked to borrow $100 on January 18, 2018, and that she gave him the money. Later that day, the Defendant and codefendant Combs met codefendant Robert Littleton at codefendant Robert Littleton's camper where the Defendant noticed the victim and "some other girl" in a bunk bed. The Defendant said she was aware that codefendant Robert Littleton was planning to ransom the victim to recover stolen money but that the victim did not appear to be in distress. Regarding the kidnapping, the Defendant said that she told codefendant Robert Littleton, "That's your deal," and then left. Early in the morning of January 19, the Defendant, the victim, and the codefendants met at codefendant Combs's house where everyone, including the victim, "got high." The Defendant said that it was during this time when codefendant Robert Littleton started "acting crazy" and became increasingly violent toward the victim.

The Defendant said that she and codefendant May, who was also her fiancé, went to codefendant May's mother's house to shower and to sleep and were later met there by the victim and some of the codefendants. Codefendant Robert Littleton ordered the victim to work in the yard and took photographs of the victim while the Defendant was there. The Defendant said that codefendant Robert Littleton kept saying that the victim's family had until 3 p.m. to pay a ransom. The group left, met codefendants Combs and Arnold, and codefendant Arnold drove the Defendant's grandfather's truck to Stone Mountain. The Defendant, the victim, and codefendants May, Robert Littleton, Leigh Katherine Littleton, and Arnold were in the truck. Codefendant Arnold stopped at a remote location, they all got out of the truck, and the victim kept saying, "I'm sorry" to codefendant Robert Littleton. According to the Defendant, codefendant Arnold kicked the victim in the knees, causing him to fall to the ground and held down the victim while codefendant Robert Littleton beat

-7-

the victim with brass knuckles. The Defendant initially said that she and codefendant May were in the truck but later said that she and codefendant May stood beside the truck during this time. The Defendant stated that she never "laid a hand on the victim" and felt unable to leave the situation.

The Defendant stated that they all returned to the truck but left the victim on the ground. The Defendant said that when they left, the victim appeared to be moving around. She also denied returning later that night with codefendants May and Combs in order to retrieve the victim's body, despite evidence that her truck made more than one trip into Tennessee that evening. During the interviews, the Defendant stressed that her memory of the events could have been impaired as a result of her drug use during this time and that she was not a violent person.

On cross-examination, Ms. Rominger testified that the Defendant agreed to be interviewed and was not under arrest during any of the interviews. Ms. Rominger stated that she was not aware of any evidence to contradict the Defendant's assertion that the Defendant did not want to be involved in codefendant Robert Littleton's threats against the victim. Ms. Rominger agreed that codefendants Robert and Leigh Katherine Littleton and codefendant Arnold "initiated the whole thing" but that the Defendant was present. Ms. Rominger acknowledged that "anyone" would have been "scared" of interrupting codefendants Robert Littleton's and Arnold's assault on the victim.

Upon this evidence, the jury found the Defendant guilty of first degree felony murder, especially aggravated kidnapping, and conspiracy to commit especially aggravated kidnapping. The trial court imposed an effective life plus twenty-year sentence. This appeal followed.

## I.    Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support her convictions because the State failed to prove that she intended to commit the underlying felony of kidnapping. The Defendant also contends the evidence was insufficient to prove that she was criminally responsible for the especially aggravated kidnapping. The State responds that the evidence was sufficient. We agree with the State.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility

of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). A conviction may be based upon circumstantial evidence alone. *See Dorantes*, 331 SW.3d at 380-381.

"The identity of the perpetrator is an essential element of any crime." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006). Circumstantial evidence alone may be sufficient to establish the perpetrator's identity. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). The identity of the perpetrator is a question of fact for the jury to determine. *State v. Thomas*, 158 S.W.3d 361, 388 (Tenn. 2005). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt[.]'" *Rice*, 184 S.W.3d at 662 (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)).

As relevant to the Defendant's appeal, first degree felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . kidnapping[.]" T.C.A. § 39-13-202(a)(2). Tennessee Code Annotated section 39-13-305(a) provides that "[e]specially aggravated kidnapping is false imprisonment . . . [c]ommitted to hold the victim for ransom or reward[.]" "Kidnapping is false imprisonment . . . under circumstances exposing the other person to substantial risk of bodily injury." *Id.* § 39-13-303(a) (2018). False imprisonment occurs when a person "knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." *Id.* § 39-13-302(a).

> "Knowing" refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

*Id.* § 39-11-302(b). Whether a defendant intended the consequences is irrelevant. *State v. Gray*, 960 S.W.2d 598, 604-05 (Tenn. Crim. App. 1997). In *State v. White*, our supreme court held that "whether the evidence, beyond a reasonable doubt, establishes each and every element of kidnapping, as defined by statute, is a question for the jury properly instructed under the law." 362 S.W.3d 559, 577 (Tenn. 2012) (internal citations omitted).

A conspiracy occurs when

> two (2) or more people, each having the culpable mental state required for the offense that is the object of the conspiracy, and each acting for the purpose of promoting or facilitating commission of an offense, agree that one (1) or more of them will engage in conduct that constitutes the offense.

T.C.A. § 39-12-103(a).

The Defendant contends that the evidence is insufficient to support her convictions for the sole reason that there was no proof that she intended to kidnap the victim. Viewed in the light most favorable to the State, the evidence showed that codefendant Robert Littleton confined the victim and that codefendants Combs and Robert Littleton requested a ransom for the victim's release. Phone records demonstrated that the Defendant made ten cell phone calls to codefendants Combs and Robert Littleton during the time of the kidnapping. The Defendant admitted that she saw the victim at codefendant Robert Littleton's camper and that she knew the victim was confined to a bunk bed area. The Defendant admitted that she was aware that codefendant Robert Littleton was holding the victim for ransom as a result of drug transaction issues. The Defendant was with the codefendants during the time the victim was confined and ordered to perform yard work. The Defendant knew codefendant Robert Littleton had become increasingly violent toward the victim and threatened the victim. The Defendant allowed codefendant Arnold to drive the Defendant's grandfather's truck to take the victim, the Defendant, and the other codefendants to the remote location where codefendants Arnold and Robert Littleton brutally assaulted the victim and left him on the ground and in freezing temperatures. The Defendant was present during the assault and could be heard on the cell phone video recording of the assault saying, "Felt good, didn't it." No one saw or heard from the victim after he was left on the snow-covered ground following the assault. Based upon the calls between the Defendant and her codefendants, her presence during the victim's assault, and her failure to aid the victim after the assault, a rational jury could infer beyond a reasonable doubt that the Defendant participated in the kidnapping plans. A rational jury could also conclude beyond a reasonable doubt that the Defendant aided in the kidnapping by volunteering her grandfather's truck to take the victim to a remote location and by encouraging those who assaulted the victim. The evidence is sufficient to show that the victim died during the course of a kidnapping. This court may not reweigh the evidence. *See Bland*, 958 S.W.2d at 659; *see also Sheffield*, 676 S.W.2d at 547.

The Defendant's argument that she merely witnessed the kidnapping and did not assault the victim is unavailing.

-10-

A person is criminally responsible for an offense committed by the conduct of another, if:

. . . .

(2) Acting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]

T.C.A. § 39-11-402 (2018). For a defendant to be convicted of a crime under the theory of criminal responsibility, the "evidence must establish that the defendant in some way knowingly and voluntarily shared in the criminal intent of the crime and promoted its commission." *Dorantes*, 331 S.W.3d at 386; *see State v. Maxey*, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994). "'[A] defendant may be convicted of especially aggravated kidnapping under a criminal responsibility theory, regardless of whether there is evidence that he directly participated in the criminal act itself.'" *State v. Mickens*, 123 S.W.3d 355, 391 (Tenn. Crim. App. 2003) (quoting *State v. Phillips*, 76 S.W.3d 1, 12 (Tenn. Crim. App. 2001)). This court has recognized that in determining whether a defendant is criminally responsible

[no] particular acts are necessary, nor is it necessary that any physical part in the commission of the crime be taken; mere encouragement is enough. 22 C.J.S. Criminal Law § 88(2) page 264. The presence of one at the commission of a felony by another is evidence to be considered in determining whether or not he is guilty of aiding or abetting; and it has also been held that presence, companionship, and conduct before and after the offense are circumstances from which one's participation in the criminal intent may be inferred. [*Id.* at 266-67.]

*State v. McBee*, 644 S.W.2d 425, 428-29 (Tenn. Crim. App. 1982); *see State v. Little*, 402 S.W.3d 202, 217 (Tenn. 2013), *abrogated on other grounds by State v. Thomas*, 687 S.W.3d 223 (Tenn. 2024).

Viewed in the light most favorable to the State, the evidence supports a conclusion that the Defendant communicated with the codefendants and was with the codefendants during the kidnapping, and that she was present when the victim was being confined, threatened, and ordered to perform yard work. The Defendant was aware that the victim was being held for ransom, and she assisted the codefendants by providing a truck to take the kidnapped victim to a location where he was assaulted and left unconscious in the snow. She accompanied the codefendants to the location and encouraged codefendant Arnold when codefendant Arnold assaulted the victim while the victim pleaded for his life. *See State v. Gevon Cortez Patton,* No. E2013-01355-CCA-R3-CD, 2014 WL 1512830, at *6

-11-

(Tenn. Crim. App. Apr. 16, 2014) (evidence was sufficient to convict the defendant of especially aggravated kidnapping and criminally negligent homicide under the theory of criminal responsibility where the defendant was with the group that kidnapped the victim and stayed at a location where the victim was being held for ransom), *perm. app. denied* (Tenn. Oct. 22, 2014). We conclude that the evidence is sufficient for a rational jury to conclude beyond a reasonable doubt that the Defendant was criminally responsible for the kidnapping. The Defendant is not entitled to relief on this basis.

## II. Exclusion of the State's Pretrial Offer

The Defendant contends that the trial court erred by excluding evidence of the State's pretrial offer to dismiss the first degree felony murder charge in exchange for the Defendant's providing information about the location of the victim's remains. Specifically, the Defendant argues that evidence of the State's offer and the Defendant's failure to accept it would have demonstrated to the jury that she had no knowledge of the victim's location. The Defendant also argues that she was deprived of her fundamental right to due process by the court's exclusion of her testimony that she did not accept the offer because she did not know the location of the victim's body. The State counters (1) that the Defendant has waived this issue by failing to include in the record a transcript of the motion hearing where this issue was addressed and by failing to make a proffer of her testimony and (2) that the trial court did not abuse its discretion by excluding the evidence because it was irrelevant to any issue before the jury.

We begin with the State's argument that the Defendant has waived appellate review because the record does not contain the transcript of the motion in limine hearing or a proffer at the trial of the Defendant's anticipated testimony. The Defendant had the burden of preparing a fair, accurate, and complete account of what transpired in the trial court relative to the issues raised on appeal. *See, e.g.*, *State v. Bunch*, 646 S.W.2d 158, 160 (Tenn. 1983). This included the obligation to have a transcript of the evidence or proceedings prepared. *See* T.R.A.P. 24(b). "When the record is incomplete, or does not contain the proceedings relevant to an issue, this [c]ourt is precluded from considering the issue." *State v. Miller*, 737 S.W.2d 556, 558 (Tenn. Crim. App. 1987). The record is deficient in the absence of the transcript or proffer, and the issue, therefore, is waived. "When the record is incomplete, or does not contain the proceedings relevant to an issue, this [c]ourt is precluded from considering the issue." *State v. Miller*, 737 S.W.2d 556, 558 (Tenn. Crim. App. 1987). Likewise, "this [c]ourt must conclusively presume that the ruling of the trial court was correct in all particulars." *Id*.

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE